IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| v. | § | CRIMINAL NO. H-12-304 |
| | § | |
| FELIX ALBERTO LAGOS | § | |

## **MEMORANDUM AND ORDER**

Defendant Felix Alberto Lagos filed a Motion to Suppress Evidence [Doc. # 16] and a Motion to Suppress Statements [Doc. # 17], to which the United States filed a Response [Doc. # 20]. At the Court's direction, Defendant filed an Amended Motion [Doc. # 24]. In the Amended Motion, Defendant seeks suppression of statements he made to federal agents, three cell phones and evidence derived from them, and "all statements resulting from custodial interrogation." The United States filed a Response [Doc. # 26] in opposition to the Amended Motion.

Following a suppression hearing on September 5, 2012, the Court ordered supplemental briefing. The United States filed its Supplemental Response on September 11, 2012. Defendant requested and obtained a lengthy extension of time to file his Supplemental Reply, which he filed on October 19, 2012. *See* Reply [Doc. # 35]. The United States requested and was granted leave to file another supplemental brief, which it filed on October 25, 2012. *See* Sur-Reply [Doc. # 36].

Having considered the full record, including the evidence presented at the suppression hearing, and having applied governing and other legal authorities, the Court **denies** the Motion to Suppress.

## I.   BACKGROUND

Based on the evidence presented at the suppression hearing, the Court finds the following. On February 19, 2012, at approximately 1:30 p.m., an anonymous 911 call was received indicating a possible immigrant hostage situation at the Red Carpet Inn on the Gulf Freeway in Houston, Texas. The call record reflects that the caller stated that he could hear Hispanic males with guns harassing several others in a room at the motel. *See* Defendant's Suppression Hearing Exh. 1 [Doc. # 28-4]. The call record indicates that the caller identified a vehicle, an Avalanche with Texas license plate # VLI8810, to be associated with the situation. *Id.* The caller described the suspect, referred to as "Susp#1," as a Hispanic male wearing a striped shirt and blue pants. Houston Police Officer Henry Posas and his partner, Officer Carreon, were dispatched to the scene, but did not observe anything suspicious at that time. They searched a few of the rooms, but did not find any hostages. One or more other anonymous calls were received by the police reporting similar information.[1]

---

[1] Because the calls were anonymous, the officers did not know whether the same caller was calling again with additional information or different individuals were calling regarding the same hostage situation.

At approximately 2:00 p.m. on February 19, 2012, another 911 call was received. This caller identified herself as "Rosa" and claimed that she and others were being held in a room at the Red Carpet Inn. Rosa described a red Chevrolet Suburban with license plate # 893307B as being used by the smugglers. Houston Police Officers Jose Compean and Panne Henson were dispatched to the scene to assist Officers Posas and Carreon. The hostage situation was classified as "Code 1," the highest emergency level under the Houston Police Department's operating guidelines.

Meanwhile, officers at the scene spotted a Chevrolet Avalanche with Texas license plate # BL18810, which 911 dispatch confirmed was registered to Rogelio Reyes, parked in the Red Carpet Inn parking lot. Officer Posas remembers hearing the name Rogelio Reyes as the registered owner of the Avalanche and the red Suburban.

Officers Compean and Henson observed Defendant driving a red Suburban with license plate # 893307B toward the parking lot exit. The officers stopped the vehicle and asked Defendant for identification. Defendant presented a Texas Identification Card in the name of Felix Alberto Lagos. Compean asked Defendant if he had any weapons and Defendant said he did not. Compean asked Defendant if he could search Defendant's person, and Defendant consented. Compean found two cell phones, one white and one black. Defendant told Compean that the white cell phone belonged to

him.  Defendant also stated that the black cell phone was not his, and that he had found it at a party.  Defendant later told Officer Henson that he found the black phone in the Red Carpet Inn parking lot.

The precise sequence of the next events is unclear, but all three events occurred within a brief period of time between 2:35 p.m. and 3:00 p.m.  At 2:48 p.m., an "event update" was dispatched providing a description of a suspect in the hostage situation as Hispanic male, hazel eyes, very short hair, short beard, short in height, wearing white shirt, blue jeans, yellow boots."  *See* Event Update, Defendant's Suppression Hearing Exh. 2 [Doc. # 28-5].  Soon after Compean found the black cell phone, that is, the phone Defendant maintained did not belong to him, it rang and Compean answered it.  A female who identified herself as Lagos's former girlfriend, Natalia Martinez, was calling.  Compean then gave both cell phones to Officer Posas.  At approximately 3:00 p.m., the black cell phone rang again and Posas answered it.  He identified himself and the caller identified herself as Lagos's girlfriend, Martinez. Martinez told Posas that Lagos and Reyes were partners in smuggling illegal immigrants.

By approximately 5:30 p.m., the hostages at the Red Carpet Inn were located. Agents with Immigration and Customs Enforcement ("ICE") were called and arrived at the scene at approximately 7:45 p.m.  Special Agent Terry Muise advised

Defendant of his right to remain silent and his right to have an attorney present during any questioning. Defendant stated that he understood his rights and, at 8:05 p.m., Defendant signed a written waiver form waiving those rights freely and voluntarily. Special Agent Muise and his partner, Special Agent Chris Kaufman, signed the waiver form as witnesses. Defendant gave consent for the agents to search the white cell phone, but said he could not give consent to search the black cell phone because it was not his.

Defendant told the ICE agents that they should be looking for Reyes, whom he described as the person in charge. Defendant told the ICE agents that Reyes offered him an opportunity to make some money by picking up wire transferred funds for aliens being smuggled, and by providing food for the aliens who were being held. Defendant admitted knowing that the aliens were illegally in the United States, but asserted that they were not mistreated. Four of the aliens held at the Red Carpet Inn identified Lagos as one of the persons involved in their detention.

## II.   **VALIDITY OF STOP AND DETENTION**

Under *Terry v. Ohio,* 392 U.S. 1 (1968), "police officers may stop and briefly detain an individual for investigative purposes if they have reasonable suspicion that criminal activity is afoot." *United States v. Gomez*, 623 F.3d 265, 269 (5th Cir. 2010) (quoting *Goodson v. City of Corpus Christi,* 202 F.3d 730, 736 (5th Cir. 2000)).

"Reasonable suspicion exists when the detaining officer can point to specific and articulable facts that, when taken together with rational inferences from those facts, reasonably warrant the . . . seizure." *United States v. Pack*, 612 F.3d 341, 352 (5th Cir. 2010) (quoting *United States v. Estrada*, 459 F.3d 627, 631 (5th Cir. 2006)). When the officers are acting without a warrant, the Government has the burden to prove reasonable suspicion. *Gomez*, 623 F.3d at 269.

### A.     Initial Stop

In this case, Officers Compean and Henson initially stopped Defendant based primarily on a series of 911 calls reporting a hostage situation at the Red Carpet Inn. "Whether a 911 call provides reasonable suspicion to justify a stop is determined on a case-by-case basis." *Id*. "The factors that must be considered in deciding whether a tip provides a sufficient basis for a traffic stop include: (1) the credibility and reliability of the informant; (2) the specificity of the information contained in the tip or report; (3) the extent to which the information in the tip or report can be verified by officers in the field; and (4) whether the tip or report concerns active or recent activity or has instead gone stale." *Id.* (citing *United States v. Martinez*, 486 F.3d 855, 861 (5th Cir. 2007)). "If a tip is provided by an anonymous informant, such that the informant's credibility and reliability cannot be determined, the Government must establish reasonable suspicion based on the remaining factors." *Id.* (citing *Martinez*,

586 F.3d at 862). "Whether an officer has reasonable suspicion must be based upon the facts known to the officer at the time." *Id.*

In this case, the first 911 call was a pure anonymous tip, as were other calls received by the police. The later call from "Rosa" was not truly anonymous. The caller identified herself by name and claimed to be one of the hostages being held in a room at the Red Carpet Inn. As one of the hostages, she had some credibility and reliability.

The 911 calls the police received contained very specific information. The callers provided descriptions of two individuals and two vehicles at a specific location. The callers provided descriptions of the two individuals believed to be holding the immigrant hostages, including their physical appearance and the clothes they were wearing. The descriptions of the vehicles included color, make, model, and license plate number.

The officers were able to verify much of the information provided. Indeed, the information regarding a red Suburban was verified by Officer Compean when he observed Defendant driving a red Suburban with the identified license plate number in the Red Carpet Inn parking lot. The information regarding the Avalanche was also verified when the vehicle was located in the same parking lot.

The information provided in the 911 calls pertained to an active "Code 1" situation. The search for the hostages reportedly hidden at the motel was ongoing. The vehicles were both still in the parking lot at the Red Carpet Inn, although Defendant was attempting to leave the scene in one of them.

The Court concludes on the record before it that the Government has satisfied its burden to prove that Officer Compean had reasonable suspicion that Defendant was engaged in an illegal immigrant smuggling operation in which aliens were being held hostage at the Red Carpet Inn. As a result, the initial *Terry* stop was valid.

### B.     Extended Detention

Defendant argues that, even if the initial stop was valid, it exceeded its permissible duration. An officer may not detain the occupants of a vehicle "beyond the time needed to investigate the circumstances that caused the stop, unless he develops reasonable suspicion of additional criminal activity in the meantime." *Pack*, 612 F.3d at 350.

In this case, the "circumstances that caused the stop" involved the Code 1 hostage situation in which Officer Compean had reasonable suspicion that Defendant was involved. The consent search of Defendant and his vehicle, and the failure to locate a weapon in either location, did not end the need to determine whether Defendant was involved in the hostage situation. Although the "police must diligently

pursue a means of investigation that is likely to confirm or dispel their suspicions quickly," the stop may be of the duration necessary to investigate the issue that initially caused the stop. *Id.* at 361.

In this case, there is nothing to indicate that the officers were dilatory in their efforts to locate the hostages and determine whether Defendant was a participant in the hostage situation. Several officers, with the assistance of the Red Carpet Inn management, were searching the approximately 200 rooms in the motel as expeditiously as possible to locate the hostages. Under the circumstances presented, the duration of the detention did not exceed the parameters of the United States Constitution. Indeed, during the time that Defendant was detained and the motel was being searched, additional information was received that supported the reasonable suspicion that Defendant was involved in the criminal hostage situation. A description of an individual participating in the hostage situation was received that matched, to a great extent, the Defendant's appearance. The phone call from former girlfriend Martinez specifically linked Defendant to immigrant smuggling with Reyes, suggesting he was associated with the hostages for whom the officers were searching. Under the specific circumstances in this case, the Court finds that Defendant's

detention was not unreasonably prolonged and that the duration of the stop did not affect the validity of the stop.[2]

### III. CELL PHONES

The only cell phone from which any evidence against Defendant was derived was the black cell phone. On at least two separate occasions, Defendant denied any ownership interest in the black phone. As a result, Defendant did not have a reasonable expectation of privacy in a cell phone he denied owning and lacks standing to challenge the evidence derived from it when Martinez called it and the officers answered. *See United States v. Quiroz-Hernandez*, 48 F.3d 858, 864 (5th Cir. 1995); *United States v. Alvarez*, 6 F.3d 287, 289 (5th Cir. 1993); *United States v. Satar*, 252 F.3d 1357, 2001 WL 422955, * 1 (5th Cir. Apr. 6, 2001).

Additionally, even if Defendant had standing to challenge the evidence obtained when the Houston Police officers answered the black cell phone, the Amended Motion to suppress that evidence would be denied. Since at least 1971, the United States Court of Appeals for the Fifth Circuit has upheld an agent's answering a telephone that rings while legitimately on the premises where the phone is located. *See United*

---

[2]The Court has concluded that the reasonable suspicion to believe that Defendant was involved in the hostage situation extended throughout the detention, the duration of which did not violate Defendant's rights under the Constitution. Although Defendant was not formally arrested, the Court finds that there existed probable cause to arrest Defendant no later than 3:00 p.m., less than one hour after the initial stop. By that time, Posas had spoken with Martinez and she had told him that Defendant was involved in immigrant smuggling with Reyes.

*States v. Kane*, 450 F.2d 77, 85 (5th Cir. 1971). In *Kane*, as in this case, the agent answered a ringing telephone and spoke with the caller. The Fifth Circuit noted that the defendant "could not have had an expectation of privacy as to a conversation in which [he] did not participate." *Id.* As was true in *Kane*, the agents here did not impersonate Defendant and there is no indication that Martinez was under the misapprehension that she was speaking to Defendant. Indeed, Officer Posas specifically identified himself.

In 1986, the Sixth Circuit similarly held that, where an agent answers a ringing telephone while lawfully at the defendant's home, there is no expectation of privacy as to any conversations in which the defendant does not participate. *See United States v. Passarella*, 788 F.2d 377, 379 (6th Cir. 1986), and cases cited therein at pp. 380-81. The Sixth Circuit noted specifically that a search warrant to search a person's premises is "not a necessary condition to answer a telephone while lawfully present" and, "once lawfully present, the police may answer a ringing telephone." *See id.* at 381. As discussed above, Officers Posas and Compean were lawfully at the Red Carpet Inn, had lawfully stopped and detained Defendant, had conducted a lawful and consensual search of Defendant's person, and had lawfully taken possession of the two cell phones. Pursuant to the *Kane* and *Passarella* decisions, the Amended Motion

to Suppress the evidence obtained when the officers answered the black cell phone when it rang is denied.

As an additional basis for denying the Amended Motion to Suppress this evidence, there were exigent circumstances that existed at the time the black cell phone was answered. Officers Posas and Compean had probable cause to believe that there was a high risk of danger to the aliens being held at the Red Carpet Inn. Indeed, the situation was being handled as a Code 1 hostage situation involving a firearm, the highest emergency level under the Houston Police Department's operating guidelines. Such exigent circumstances justify the officers' answering the black cell phone when it rang. *See United States v. Gomez*, 807 F. Supp. 2d 1134, 1150 (S.D. Fla. 2011).

Defendant did not have a reasonable expectation of privacy in the black cell phone because he repeatedly asserted that the phone was not his. Defendant did not have a reasonable expectation of privacy in the conversation between the officers and Martinez because he was not a participant in the conversations. Exigent circumstances, particularly the Code 1 hostage situation, justified the officers' conduct in answering the ringing black cell phone. The Amended Motion to Suppress the evidence derived from the black cell phone conversation with Martinez is denied.

## IV.  STATEMENTS

As discussed above, there was reasonable suspicion to stop and to detain Defendant until the hostages were found.  The ICE agents explained Defendant's *Miranda* rights to him, Defendant stated that he understood those rights, and Defendant signed a form acknowledging that he waived those rights freely and voluntarily. *See* Statement and Waiver of Rights, Government's Suppression Hearing Exh. 7 [Doc. # 28-3].  The Court finds that Defendant knowingly and voluntarily waived his rights as explained by the ICE agents and, therefore, the motion to suppress his statements to them is **denied**.[3]

## V.  CONCLUSION AND ORDER

Based on the foregoing, the Court finds that Defendant's rights were not violated during his detention, arrest, and search on February 19, 2012.  There existed probable cause for the investigative stop, and the duration of the stop was reasonable under the circumstances.  Additional information obtained during the stop could have provided the officers with adequate probable cause to arrest Defendant, but he was not

---

[3] In the Amended Motion, Defendant seeks suppression of "Statements made by Defendant" to the federal agents, as well as "All statements resulting from custodial interrogation." *See* Amended Motion, p. 6.  Neither Defendant nor the United States has identified any incriminating statements by Defendant resulting from custodial interrogation other than those given to the ICE agents after Defendant was advised of and waived his right to remain silent and to have an attorney present for any questioning.  As a result, there are no other "custodial interrogation" statements to suppress.

formally arrested at that time. The only evidence obtained from a cell phone was obtained from a phone in which Defendant repeatedly denied any ownership interest. Defendant's statements to ICE agents were made after he was advised of his rights and waived them voluntarily. Accordingly, it is hereby

**ORDERED** that Defendant's Motions to Suppress [Docs. # 16, # 17, and # 24] are **DENIED**.

SIGNED at Houston, Texas, this 30th day of **October, 2012**.

_____
Nancy F. Atlas
United States District Judge